**Opinion issued November 1, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00802-CV

————————————

## CATHERINE CHURCH, RICHARD H. CHURCH, AND SHEILA P. CHURCH, Appellants

## V.

## EXXON MOBIL CORPORATION, Appellee

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-66696**

## MEMORANDUM OPINION

Catherine Church and her parents, Richard H. Church and Sheila P. Church,

appeal a take-nothing judgment rendered in favor of ExxonMobil Corporation.

Catherine, then a minor, was injured when a restroom sink in an Exxon gas station

and convenience store fell to the floor and shattered, severing her Achilles tendon. The jury found Catherine was negligent and ExxonMobil was not, and the trial court rendered judgment that the Churches take nothing. The Churches raise three issues on appeal. They contend that the trial court erred by admitting ExxonMobil's expert's testimony because it was conclusory and speculative. They also contend that the evidence was legally and factually insufficient to support the jury's finding that Catherine was negligent, and that the evidence conclusively proved that ExxonMobil was negligent. Finding no error, we affirm.

## Background

Catherine Church had been to the beach in Galveston with friends and was on her way home when one of the friends, Brittney Schoen, needed to use the restroom. They stopped at an Exxon gas station owned by ExxonMobil Corporation, and Catherine and Brittney went into the women's restroom. As Brittney used the facilities, Catherine leaned against the restroom sink. The sink fell off the wall and shattered when it hit the floor. A shard from the sink cut Catherine's leg, severing her Achilles tendon. This incident led the Churches to bring a premises liability claim against ExxonMobil.

The evidence at trial showed that there was no apparent problem with the sink or the manner in which it was installed. Neither Catherine nor Brittney noticed anything wrong with the sink before it fell. Similarly, ExxonMobil

introduced a photograph of the sink in the men's restroom, which was installed at the same time and in a similar manner to the sink in women's restroom, and it also appeared normal, with no indication of any problem. ExxonMobil also introduced evidence of its "mystery shopper" program. A mystery shopper is hired by an independent, third-party company to visit ExxonMobil locations and perform an incognito inspection of each store's condition and its employee's conduct. Approximately ten days before Catherine's accident, a mystery shopper had visited the gas station and noted no problems with the women's restroom. A photograph of the sink taken by the mystery shopper did not reveal any apparent problems with the sink or its installation.

The Churches and ExxonMobil presented competing experts to render opinions about how the incident occurred. The Churches' expert was Thomas Scott, a safety consultant, who sponsored what came to be called the "teeter-totter" theory to explain how the sink fell. Scott explained that the sink sat on a wall bracket, with metal "ears" of the bracket sliding into "pockets" on the sink. The sink also had holes for "anchor screws, which, if installed, would pass through the holes in the sink and into the wall. The sink that fell, however, did not have the anchor screws installed. Scott opined that as Catherine leaned on the right side of the sink, the left side was lifted, rising sufficiently to clear the ear of the wall bracket, and then the sink was able to fall. Scott also opined that if the anchor

3

screws had been installed, the sink would not have been able to teeter-totter and fall. Scott pointed out that the sink manufacturer's instructions stated anchor screws should be installed, the anchor screws were not installed on this sink, and the failure to install the anchor screws created "a safety risk for the public" and a "substantial hazard." Scott also testified that, in his opinion, ExxonMobil should have known about the improper installation and did not have an adequate inspection process for discovering this type of problem.

ExxonMobil presented Ed Jensen, a professional engineer and safety consultant. Jensen testified that when he looked at a photograph of the restroom taken a day or two after the accident, he noticed that the right ear on the wall bracket was bent. He thought this significant and it became a focus of his investigation and testimony. After doing some background research on the sink, including contacting the manufacturer for technical data, Jensen conducted a series of experiments on newly-purchased sinks of the same model as the one that injured Catherine, to see whether and under what conditions the sink would "fail"—that is, fall or break in a manner similar to what Catherine described.

Jensen started with sinks of the same model as the one involved in this accident. The bracket that came with it seemed too thin and did not appear to be similar to the bracket in the photograph of the restroom. He contacted the manufacturer and was able to obtain a bracket that appeared to be the same as the

4

one in the photograph. He attached the bracket to a two-by-ten board that was attached to two heavy duty workstands (similar in appearance to a sawhorse). Jensen then mounted the sink to the bracket.

Jensen loaded the sink with weights. In his first experiment, the bracket was attached to the two-by-ten by all mounting bolts and the sink did not have the anchor screws installed. Jensen gradually loaded weight on the front center of the sink. He gradually increased the weight to 150 pounds, but he observed no damage or bending to the sink or wall bracket. Next, he placed 150 pounds on the right corner of the sink. Again, he observed no damage or bending. Jensen then removed one bolt from the mounting bracket, because the photograph of the bracket after Catherine's accident showed one bolt missing from the bracket. In that experiment, he continued loading weight onto the front right corner in increments of ten to twenty pounds. Neither the sink nor the bracket suffered any bending or damage until Jensen loaded 220 pounds, when the sink broke—that is, the porcelain material of the sink cracked and the sink fell. A small piece of the sink remained mounted on the left ear; the rest fell forward and to the right. A photograph after this experiment shows the right ear of the wall bracket bent in a manner similar to the ear on the bracket in ExxonMobil's gas station.

Having caused the sink to fail in what he opined was a similar manner to Catherine's accident, Jensen "didn't really have a plan" for his remaining

5

experiments. First, he performed the same test as the one that caused the sink to fail, but this time he installed all the bolts in the mounting bracket. The sink did not fail until 330 pounds had been stacked on the front right corner. Next, he used all the mounting bolts and the two anchor screws. He dropped 120 pounds from a height of six inches onto the front right corner. The sink did not break or fall, but "rattled back and forth a little bit," and the bracket bent slightly. Finally, Jensen put all the mounting bolts and anchor screws in the last sink and loaded it with weights; it did not fail until 320 pounds had been loaded. With the anchor screws in place, the sink simply broke where it was attached to the bracket and did not bend the bracket.

Based on his experiments, Jensen concluded the accident could not have occurred as Catherine said it did. He based this opinion primarily on the fact that the evidence showed Catherine weighed 120 or 125 pounds, but the sink in his experiment was not damaged or affected by a similar weight. Rather, it took significantly more weight to cause the sink to fail. He opined that some force had to be applied to the sink that would not be present if Catherine were merely leaning against the sink. He stated that for Catherine, weighing about 120 pounds, to generate the force that broke the sink, it would be something equivalent to hopping up on the sink, although he acknowledged he could not say that that in fact happened. Jensen also opined that the lack of anchor screws did not cause the sink

6

to fall. He explained that the anchor screws were "more of a security issue, so somebody doesn't come in there and lift [the sink] up off the mounts."

The Churches' counsel subjected Jensen to a vigorous cross-examination. Counsel, through his questioning, identified several areas in which there was a disconnect between Jensen's experiments and the evidence in the case. One of the most significant criticisms was that Jensen's experiment ignored Catherine's and Brittney's testimony. They testified that Catherine leaned against the sink, and thus generated some lateral force, not simply downward force. Jensen's experiment, by gradually stacking weights on the edge of the sink, applied only downward force and no lateral force against the sink. Likewise, the Churches' counsel pointed out that the sinks and brackets Jensen used in his experiments were brand new, while the sink at the gas station was installed fifteen years before Catherine's accident. The photograph of the restroom after the accident also did not show any part of the sink remaining on the bracket as occurred during Jensen's test. And Jensen's test sink was not attached to water or drain lines, as was the sink in the restroom. On cross-examination, Jensen also acknowledged that the anchor screws would have prevented the sink from lifting up off the ears of the bracket and that the ear could have been bent if the opposite side of the sink had risen far enough to lift off the bracket. During his testimony, Scott, the Churches' expert, had also criticized Jensen, stating that he had no problem with how Jensen

7

conducted his tests; rather, he stated that Jensen's tests "had nothing to do with the case," because Jensen had not performed a test similar enough to the actual conditions to simulate what had occurred.

The jury, in response to the first question in the charge, unanimously found that ExxonMobil's negligence, if any, was not a proximate cause of the occurrence or injury and that Catherine's negligence was. The jury accordingly did not answer any other questions. The trial court rendered a take-nothing judgment in favor of ExxonMobil, and the Churches appealed.

## Sufficiency of Jensen's Testimony

In their first issue, the Churches contend that the trial court erred by admitting Jensen's opinion testimony "because his opinions were conclusory and speculative, and therefore legally insufficient to support the jury's finding that Plaintiff was negligent and Defendant was not negligent." ExxonMobil responds that this issue is waived because it was not timely raised before the trial court. Specifically, ExxonMobil contends that the Churches are not challenging the expert testimony as conclusory—a challenge that may be raised for the first time on appeal. ExxonMobil argues that the Churches, although they call it an objection that the opinion is conclusory, are actually challenging the reliability of the expert's opinion. Such a challenge, they argue, may not be raised for the first time on appeal, but must be raised before trial or when the evidence is offered.

8

## A. Preservation of Challenges to Expert Testimony

"To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998). The Texas Supreme Court has re-visited the *Maritime* rule in *Coastal Transp. Co. v. Crown Central Petroleum Corp.*, 136 S.W.3d 227 (Tex. 2004) and *City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009). In *Pollock*, the supreme court re-emphasized that complaints about an expert's methodology, technique, or foundational data, must be made in the trial court:

> [There is] a distinction between challenges to an expert's scientific methodology and no evidence challenges where, on the face of the record, the evidence lacked probative value. When the expert's underlying methodology is challenged, the court necessarily looks beyond what the expert said to evaluate the reliability of the expert's opinion. When the testimony is challenged as conclusory or speculative and therefore non-probative on its face, however, there is no need to go beyond the face of the record to test its reliability. We therefore conclude that when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. However, when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility.

*Pollock*, 284 S.W.3d at 817 (quoting *Coastal*, 136 S.W.3d at 233). Thus, while a no-evidence challenge asserting that the expert opinion is conclusory need not be preserved to be raised on appeal, a no-evidence challenge based on methodology or

a lack of reliability must be raised before trial or when the evidence is offered. *Pollock*, 284 S.W.3d at 817; *Coastal*, 136 S.W.3d at 232–33; *Maritime*, 971 S.W.2d at 409. If no party objects, an unreliable opinion may be considered probative evidence. *Pollock*, 284 S.W.3d at 818. It is only when "no basis for the opinion is offered, or the basis offered provides no support," that the opinion rises to the level of a conclusory or speculative opinion that cannot be considered probative evidence, even in the absence of a timely objection. *Id.*

## B.   Church's Challenge to Jensen's Testimony

The Churches did not object to Jensen's testimony before trial or when it was offered. Whether the Churches preserved this issue for appeal depends, therefore, on whether they challenge Jensen's testimony as conclusory or as unreliable. In their brief, the Churches repeatedly assert that Jensen's opinion was conclusory and speculative. The Churches list a dozen reasons to support this assertion, including:

- Jensen placed the weights on the sink one at a time, gradually increasing the weight but Catherine testified "she leaned against the sink all at once."

- The weights were placed on the edge of the sink resulting in a single, downward force applied to the sink. However, the Churches contend that when Catherine leaned against the sink, it created other forces, including upward and horizontal or lateral forces.

- The weights were stationary, but Catherine testified she leaned and moved into position on the sink, creating dynamic forces.

10

- Jensen used a test sink that was new and did not consider the possible effect of the age of the sink or what other forces may have been applied to it over the course of fifteen years.

- The sink was not attached to water or drainage lines like the actual sink.

- The wall on which Jensen mounted the test sink was constructed differently from the actual wall at the gas station.

In sum, the Churches argue that Jensen's experiments were not "substantially similar" to the actual event.

**C.    Analysis**

An opinion is conclusory if it does not state the underlying facts and explain how those facts support the conclusion reached.  *Taylor v. Alonso, Cersonsky & Garcia, P.C.*, No. 01-11-00078-CV, 2012 WL 3773041, at *6 (Tex. App.— Houston [1st Dist.] Aug. 30, 2012, no. pet. h.) (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010) and *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 n. 32 (Tex. 2008)); *see also In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007) (stating that expert must provide factfinder facts and data underlying expert's testimony for factfinder "to accurately assess the testimony's worth").

Jensen explained the facts underlying his conclusions and how those facts supported his conclusions: he based his conclusions on the outcomes of his experiments, which he described for the jury in detail.  The Churches complain on

11

appeal that Jensen's experiments did not take into account all the factors in play on the day of Catherine's accident. To evaluate the merits of the Churches' complaint, we must evaluate Jensen's underlying methodology, technique, or foundational data. *See Pollock*, 284 S.W.3d at 817 (quoting *Coastal*, 136 S.W.3d at 233). That is, we must examine whether too great an analytical gap exists between the conditions present during Jensen's experiments and the conditions in the ExxonMobil restroom on the day Catherine was injured. This is precisely the type of complaint that requires the appellant to have made a timely objection in the trial court. *See id.*; *see also Lincoln v. Clark Freight Lines, Inc.*, 285 S.W.3d 79, 84 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Fort Worth & Denver Ry. v. Williams,* 375 S.W.2d 279, 281–82 (Tex. 1964)) (describing "substantial similarity" requirement for out-of-court experiments and stating that the issue is one for the trial court to consider in its gatekeeping function when determining whether testimony is reliable enough to be admissible). Because the Churches did not object before trial or when the testimony was offered, we conclude that they have not preserved their first issue for review.

## Sufficiency of the Evidence

In their second issue, the Churches contend that no evidence or factually insufficient evidence supports the jury's finding that Catherine was negligent. In their third issue, the Churches contend that the trial court erred by denying their

motion for new trial because the evidence conclusively established that ExxonMobil was negligent.

## A. Standard of Review

Under a legal-sufficiency review, we credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *Williams v. Dardenne*, 345 S.W.3d 118, 123 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). The evidence is legally insufficient if the record shows: (1) a complete lack of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810; *Williams*, 345 S.W.3d at 123. When the legal sufficiency challenge is made against an adverse finding on an issue on which the complaining party had the burden of proof at trial, that party must demonstrate that the evidence establishes conclusively, i.e., as a matter of law, all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

When a party who had the burden of proof at trial complains of the factual insufficiency of an adverse finding, it must demonstrate that the adverse finding is

13

contrary to the great weight and preponderance of the evidence. *Id.* at 242. We weigh all the evidence and set aside the adverse finding "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

In both legal and factual sufficiency cases, the factfinder is the sole judge of witnesses' credibility and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819 (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). The factfinder may choose to believe one witness over another. *City of Keller*, 168 S.W.3d at 819. A reviewing court must assume that the factfinder resolved all conflicts in the evidence in accordance with its decision if a reasonable factfinder could have done so. *See id.* at 820. A reviewing court may not "impose [its] own opinions to the contrary" or "substitute its judgment for that of the jury." *Id.* at 820; *Golden Eagle Archery*, 116 S.W.3d at 761.

## B. Catherine's Negligence

The jury charge instructed the jury that Catherine was negligent if "she failed to use ordinary care, that is, she failed to do that which a person of ordinary prudence would have done under the same or similar circumstances or did that which a person of ordinary prudence would not have done under the same or

14

similar circumstances."[1] On appeal, the Churches contend that leaning against a sink cannot amount to contributory negligence as a matter of law. We do not need to address the issue so broadly.

In this case, viewing the evidence in the light most favorable to the jury's verdict, we conclude that some evidence supports the jury's finding. The Churches rely primarily on the fact that the only direct evidence of what happened in the ExxonMobil station restroom came from Catherine and Brittney. That evidence, the Churches contend, compels the conclusion that Catherine was not negligent. The jury, however, was free to disbelieve that testimony. Jensen's experiment produced a result—a sink that fell to the floor and left behind a wall bracket with a bent ear—that was similar to what was shown in the photograph of the sink Catherine's accident. The jury could have reasonably believed Jensen's testimony and determined that the accident did not occur as Catherine and Brittney described, but rather that Catherine was doing something other than merely leaning against the sink when it fell. Because the jury is the sole judge of the credibility of the witnesses and is entitled to resolve any conflicts in the evidence or reasonable inferences to be drawn from the evidence, we conclude that a rational juror could

---

[1] The Churches did not object to the instruction related to Catherine or the instruction concerning ExxonMobil. In the absence of an objection to the trial court's charge, we review the legal sufficiency of the evidence in light of the charge and instructions the trial court gave the jury. *Carlton Energy Group, LLC v. Phillips*, 369 S.W.3d 433, 444 (Tex. App.—Houston [1st Dist.] 2012, pet. filed) (citing *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000)).

have disregarded Catherine's testimony and concluded that she was negligent. We therefore hold the evidence is legally sufficient to support the verdict. *See City of Keller*, 168 S.W.3d at 823. Similarly, giving the proper deference to the jury's implicit credibility findings, the evidence that Catherine was negligent is not so weak or the finding of Catherine's negligence is not against the great weight and preponderance of the evidence so as to make the finding clearly wrong and unjust. *See Golden Eagle Archery*, 116 S.W.3d at 761. We therefore hold that the evidence is factually sufficient to support the jury's finding.

## C.    ExxonMobil's Negligence

The Churches contend that the evidence established the elements of their premises liability claim as a matter of law. It is undisputed that Catherine was an invitee on ExxonMobil's premises. When the claimant is an invitee, the owner or occupier must use reasonable care to protect the invitee from a condition on the premises that creates an unreasonable risk of harm of which the owner or occupier knew or through the exercise of reasonable care should have known. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000); *Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 910 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The jury charge asked whether ExxonMobil's negligence proximately caused Catherine's injury and instructed the jury it could find ExxonMobil negligent with respect to a condition of the premises if:

a. the condition posed an unreasonable risk of harm, and

b. Exxon Mobil Corporation knew or reasonably should have known of the danger, and

c. Exxon Mobil Corporation failed to exercise ordinary care to protect Catherine Church from the danger, by both failing to adequately warn Catherine Church of the condition and failing to make that condition reasonably safe.

*Cf. CMH Homes, Inc.*, 15 S.W.3d at 99 (listing elements of premises liability claim). The jury was further instructed that "ordinary care" with respect to ExxonMobil's conduct as the owner or occupier of the premises meant "that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances." For the Churches to prevail on this no-evidence point, the evidence must establish all the elements of their premises liability claim as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

The Churches assert that the failure to support the sink with anchor screws created a dangerous condition that posed an unreasonable risk of harm. However, the only evidence they identify to support this assertion is that "[t]he sink fell off the wall when Catherine leaned on it." A condition poses an unreasonable risk of harm for a premises liability claim when there is a "sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002) (quoting *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d

17

752, 754 (Tex. 1970)).  "Foreseeability in this context 'does not require that the exact sequence of events that produced an injury be foreseeable.' Instead, only the general danger must be foreseeable." *Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 646 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (quoting *Cnty. of Cameron*, 80 S.W.3d at 556).

The mere fact that the accident occurred is not, of itself, evidence that there was an unreasonable risk of such an occurrence.  *Smylie v. First Interstate Bank, Texas*, No. 14-99-00713-CV, 2000 WL 1707308, at *2 (Tex. App.—Houston [14th Dist.] Nov. 16, 2000, no pet.) (mem. op.) (citing *Dabney v. Wexler-McCoy, Inc.*, 953 S.W.2d 533, 537 (Tex. App.—Texarkana 1997, pet. denied)); *see also Thoreson v. Thompson*, 431 S.W.2d 341, 344 (Tex. 1968).   Evidence of a similar injury or complaint (or lack of the same) caused by the condition can be probative of whether the condition posed an unreasonable risk of harm, but is not conclusive. *Hall*, 177 S.W.3d at 646; *see also Dietz v. Hill Country Restaurants, Inc.*, No. 04-10-00682-CV, 2011 WL 6206985, at *5 (Tex. App.—San Antonio Dec. 14, 2011, no pet.) (citing *Seideneck*, 451 S.W.2d at 754).  "Whether a particular condition poses an unreasonable risk of harm is generally fact specific, and there is no definitive test for determining whether a specific condition presents an unreasonable risk of harm." *Farrar v. Sabine Mgmt. Corp.*, 362 S.W.3d 694, 701

18

(Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Hall*, 177 S.W.3d at 646); *see also Dietz*, 2011 WL 6206985, at *5 (citing *Seideneck*, 451 S.W.2d at 754).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude the evidence does not conclusively establish that the absence of anchor screws posed an unreasonable risk of harm. The fact that Catherine was injured is, without more, no evidence of an unreasonable risk of harm. *See Smylie*, 2000 WL 1707308, at *2. And although the Churches presented Scott's testimony that the absence of anchor screws posed an unreasonable risk of harm, there was no evidence of any prior complaints, incidents, or similar accidents with the sink or the similar sink in the men's restroom, which had been installed approximately fifteen years before Catherine's accident. Scott also conceded that anchor screws are not commonly installed on sinks. Additionally, Scott's opinion was controverted by Jensen's testimony that the purpose of the anchor screws is to prevent an upward force from lifting the sink and that his testing indicated that the accident could not have occurred from the lateral and downward force that Catherine described, even though he conducted his first test without the anchor screws installed. He also explained that his testing showed that the sink could fail even with anchor screws installed. In light of the conflicting evidence at trial, we conclude that the evidence did not conclusively establish that the failure to install anchor screws on the sink created an unreasonable risk of harm *See Dietz*, 2011

19

WL 6206985, at *6 (holding summary judgment proper because no evidence of unreasonable risk of harm where condition—depression in sidewalk—had been present for eighteen years with no prior accidents or complaints); *see also Univ. of Tex.-Pan Am. v. Aguilar*, 251 S.W.3d 511, 513–14 (Tex. 2008) (no evidence of unreasonable risk of harm where no complaints of placement of water hoses in previous five years); *Smith v. Mohawk Mills, Inc.*, 260 S.W.3d 672, 675 (Tex. App.—Dallas 2008, no pet.) (holding plaintiff did not meet burden of producing evidence that condition posed unreasonable risk of harm where plaintiff argued that the condition had existed for short period, so that lack of prior incidents should not be considered evidence that there was no unreasonable risk). Having concluded that the evidence did not establish as a matter of law that the sink posed an unreasonable risk of harm, we hold that the jury did not err in finding that Exxon was not negligent.

We overrule the Churches' third issue.

## Conclusion

We affirm the judgment of the trial court.


Rebeca Huddle
Justice

Panel consists of Justices Jennings, Bland, and Huddle.

20